UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SHANNON KING, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-911 |
| | § | |
| STEVENSON BEER DISTRIBUTING CO, *et* | § | |
| *al*, | § | |
| | § | |
| Defendants. | § | |

**OPINION AND ORDER**

Pending before the Court in the above referenced cause, alleging violations of Plaintiff Shannon King's ("King") rights under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et. seq.*, Chapter 21 of the Texas Labor Code (formerly known as the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE § 21.001, *et. seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C.§ 201, *et seq*., is King's Motion for Partial Summary Judgment on his FLSA claim (Doc. 13) and Defendants Stevenson Beer Distributing Company ("SBD") and Kurt Stevenson's ("Stevenson") (collectively, "Defendants") Motion for Summary Judgment (Doc. 14) on all of King's claims.

Also pending is King's unopposed Motion for Leave to File First Amended Complaint ("FAC") (Doc. 15) to remove the collective allegations from his FLSA claim and proceed in his individual capacity alone.  King's motion for leave to file his FAC is granted, and the Court will consider the pending motions for summary judgment and for partial summary judgment on the claims as put forth in the FAC (Doc. 15-1).  Having considered the motions, and the responses thereto,[1] the summary judgment evidence, and the applicable law, the Court concludes that

---

[1] Responsive pleadings include the following:
   Pl's Resp. to Def.'s Mot. for Summ. J. (Doc. 17)

Plaintiff's motion for partial summary judgment is denied, and Defendants' motion for summary judgment is granted.

## I.     Background

SBD is a wholesale beer distributor that distributes Anheuser-Busch, Coors, Corona, and other products to retailers in Trinity County, Texas and surrounding counties.  Decl. of Kurt Stevenson ("Stevenson Decl.") ¶ 2 (Doc. 14, Ex. B).  Defendant Kurt Stevenson is the president of SBD.  *Id.*  SBD has approximately fifty employees who work within two recognizable divisions or departments: sales and warehouse.  Dep. of Kurt Stevenson ("Stevenson Dep.") at 15:6–21 (Doc. 14, Ex. A).  During the time period relevant to King's claims, between 2009 and 2010, SBD had between three and four "teams" in the sales division where King worked.  Dep. of Shannon King ("King Dep.") at 18:13–18 (Doc. 13, Ex. A); Stevenson Decl. ¶ 3; SBD Org. Chart (Doc. 14, Ex. E).  The "teams" were arranged according to geography and sales volume.  SBD Org. Chart; Stevenson Dep. at 24:15–28:23.  Each team consisted of three to five salesmen and an approximately equal number of drivers, one or two merchandisers, two or three helpers, and one team leader.  SBD Org. Chart; Email Re Sales Assignments (Doc. 14, Ex. F); King Dep. at 74:3–77:13.  The team leaders reported to the operations/sales manager.  SBD Org. Chart; King Dep. at 62:16–63:15.

King began his employment with SBD as a driver in 1981 and worked his way up through the sales division to a team leader position.  King Dep. at 37:13–16.  He held the team leader position for ten years prior to his termination, including during the time period relevant to his FLSA claims.  *Id.* at 38:2–5.  In his capacity as a team leader, King supervised between seven and thirteen employees.  King Dep. at 74:8–77:13.  King began his workday by meeting with his

---

Def.'s Resp. to Pl.'s Mot. for Summ. J. (Doc. 18)
Def.'s Reply in Supp. of its Mot. for Summ. J. (Doc. 20)

team members to assign the daily deliveries and other tasks such as, rotating beer, setting up displays and merchandising, and cleaning keg lines, for the team's sales routes.  *Id.* at 285:11–289:9; Decl. of Ricky Pitcock ¶ 5 ("Pitcock Decl.") (Doc. 14-7); Decl. of Eddie Hollis ¶ 5 ("Hollis Decl.") (Doc. 14-8).  When assigning these duties, King took into consideration the unfinished deliveries and tasks that carried over from the previous day, the times when certain retailers accepted deliveries, and other promotional activities and tasks that needed to be accomplished within a given week or month.  King Dep. at 74:8–77:13; Pitcock Decl. ¶ 5; Hollis Decl. ¶ 5.   After meeting with his team, King inspected inventory on the delivery trucks and then spent an average of one to three hours completing reports regarding the salesmen's performance on the assigned tasks.  King Dep. at 112:3–9, 130:1–10, 349:7–350:25; Pitcock Decl. ¶ 5; Hollis Decl. ¶ 5.  Two to three days per week, King accompanied his salesmen on "ride withs" along the sales route.  *Id.* at 128:16–129:7; Pitcock Decl. ¶ 6; Hollis Decl. ¶ 6.  King described these "ride withs" as "giant long coaching sessions" during which he inspected and critiqued the salesmen's performance of their duties.  *Id.* at 156:10–157:69; Pitcock Decl. ¶ 6; Hollis Decl. ¶ 6.  During the "ride withs," King completed forms that graded the performance of the salesmen with regard to "inventory, signage, sales, and rotation," which were later used to determine the salesmen's monthly salary bonuses.  King Dep. at 126:17–24, 148:11–150:4, 164:6–14, 354:14-12; Pitcock Decl. ¶ 7; Hollis Decl. ¶ 7; Dep. of Lori Smith ("Smith Dep." 31:14–32:6 (Doc. 14-10).  On days when King did not accompany his salesmen on a "ride with," he visited the retailers in his territory independently to maintain relationships with the retailers and inspect the signage, inventory, shelf space, and product rotation.  *Id.* at 159:9–161:25; Pitcock Decl. ¶ 9; Hollis Decl. ¶ 9.  On rare occasions, King was directed by the operations manager to fill in for a salesman or address a problem for a retailer.  King Dep. 129:15–6.

The record includes a job description for the team leader position.  Although King claims that he never saw a copy of the job description, he does not dispute that it accurately summarizes his primary duties.  Doc. 13 at 4–5.  The job description lists the team leaders' essential functions as follows:

(1) Check and monitor sales reps rotation – while conducting ride withs check rotation performance of sales reps. In the event that poor rotation is found, document and write up sales rep for poor rotation.  Provide list of out of date product to sales manager.  Help sales reps develop a rotation plan that best meet their route schedule.

(2) Schedule ride with/team sell to meet AB guidelines – Quarterly schedule posted the beginning of each quarter.  Each ride with to be implemented from first stop to last stop…

(3) Manage subordinates – Coordinate schedules for salesmen, merchandisers, drivers and helpers.  Manage "call ins" and days off to ensure all positions are covered.  Sales Manager will pre sell all routes when their salesman [is] off. Communicate daily with merchandisers to ensure they have a detailed instruction [of] the day[']s task.  Provide them with an organized list of keg lines to be cleaned in their areas (average so many per day each to ensure all get cleaned every 14 days).

(4) Planagram accuracy reporting – Fully understand how to use space management software…

(5) Display/Taps reporting – Make sure all sales rep accurately report their displays each week.  Get with Sales Manager on Friday mornings to discuss any account that is not turned in.  Make sure all sales reps accurately report their taps (brands and numbers) once per month.  At the end of the third week of the month[,] review with sales mngr to identify the accounts that were not tracked. Make sure sales reps update line cleaning as they are preselling in Mobility to ensure lines being cleaned every 14 days minimum.

(6) POS tracking and distribution – As POS enters the warehouse, split up paper POS and place it in each sales reps POS area.  Permanent POS to be locked up in team leaders POS rooms.  No permanent POS to leave warehouse without the correct documentation being filled out as for which account it is being placed and when it is to be placed.  Organize each sales reps POS folder to track POS at each acct.  Monitor sales reps POS bends once per month for cleanliness.

(7) Monitor sales reps each day to make sure they get their order in by 4:00PM on the days they sell 24hrs ahead of routes.  Also monitor that store inventories are being keyed in at every account.

(8) Must refresh BUSCH SELLING skills every 5 years.

(9) Conduct 5 monthly Quality Audits for Coors and turn in to sales manager each month.  Accounts to be randomly selected and conducted in the same order that Coors Brewery conducts them.  Can be done during a ride with.

(10) Take one Corona class online every 2 months.

(11) Assign point sheet objectives to be submitted and assign accounts.

(12)  Ensure all training has been completed for each salesman so that he/she understands every detail of job duties.  Once training is completed, salesman will sign checklist as acknowledgement that he/she received specified training.  Team Leader will submit checklist to operations manager.

(13) Operate all modules through Mobility software.

(14) Organize Vacation Days/Days Off:  Ensure no more than one salesman is off at a time.  Sales Manager will pre sell all routes when their salesman is off.  (NO EXCEPTIONS)

(15) Monitor daily GPS reports of assigned salesmen and pull up staff.

Team Leader Job Description (Doc. 13, Ex. D).  As a team leader, King worked in excess of forty hours per week and was paid a fixed salary without overtime.  FAC ¶¶ 42–44.

In October or November of 2010, SBD discovered that King attempted to redistribute expired product in his market in violation of SBD and Anheuser-Busch policy.  *Id.* ¶¶ 34–39; Stevenson Decl. ¶ 5; Stevenson Dep. at 114:16–116:2.  SBD deducted the cost of the expired product from King's compensation.  FAC ¶ 37.  On December 31, 2010, SBD terminated King.  *Id.* ¶ 38.  King is a protected employee under the ADEA.  *Id.* ¶ 56.  He alleges that he was terminated on the basis of his age, in violation of the ADEA and the TCHRA, since younger employees who attempted to redistribute expired product were not terminated and therefore were treated more favorably.  *Id.* ¶ 39.

King timely filed a charge of age discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission Civil Rights Division.  FAC ¶ 2.  On or after December 28, 2011, the EEOC issued a Notice of Right to Sue letter and King timely filed the instant suit on March 26, 2012.  *Id.* ¶ 3.  In addition to his age discrimination claims, King alleges that SBD violated the FLSA by willfully misclassifying him as an exempt employee and failing to pay overtime wages owed to him.  FAC ¶¶ 52–53.  He claims that as a team leader, he often performed the duties of a non-exempt employee and was regularly required to work in excess of forty hours per week.  *Id.* ¶¶ 43–44.

King seeks to recover unpaid overtime wages under the FLSA, as well as equitable relief, actual damages, exemplary and compensatory damages, liquidated damages, and attorney's fees, for Defendants' allegedly willful violations of the ADEA, TCHRA, and FLSA.  *Id.* ¶ 58.  King filed a motion for summary judgment on his FLSA claim seeking an affirmative finding that (1) Defendants are an enterprise covered by the FLSA; (2) Defendants are employers of Plaintiffs; (3) Defendant Kurt Stevens was an individual employer of Plaintiff; (4) Plaintiff worked more than forty (40) hours in a work week; (5) Defendants failed to pay Plaintiff time and one-half his regular rate of pay for hours worked over forty (40) in a work week; and (6) Defendants' failure to pay Plaintiff proper overtime wages was in willful violation of the law, thereby extending the limitations period for his claim to three years.  Doc. 13.

Defendants have moved for summary judgment on the grounds that (1) that King is exempt under the executive, administrative, or outside sales exemptions, or a combination thereof; (2) King cannot meet his burden to show that SBD's purported FLSA overtime violation was willful; and (3) King cannot establish a *prima facie* case of age discrimination.  Doc. 14 at

1–2.  Defendants also filed a response to King's motion for partial summary judgment making the same arguments.  Doc. 18.

## II.      Summary Judgment Standard

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The substantive law governing the suit identifies the essential elements of the claims at issue, and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A dispute of material fact is "genuine" if the evidence would allow a reasonable jury to find in favor of the non-movant.  *Id.* All reasonable inferences must be drawn in favor of the nonmoving party.  *Matsushita*, 475 U.S. at 587–88; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

A party moving for summary judgment bears the burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving part is entitled to summary judgment as a matter of law.  FED. R. CIV. PRO. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 885 (1990); *Edwards v. Your Credit, Inc.,* 148 F.3d 427, 431 (5th Cir. 1998).  If the movant bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding any of the essential elements of the claim or defense to warrant judgment in his favor.  *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish

beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).  If the movant fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).

If the movant meets its burden and points out an absence of evidence to prove an essential element of the non-movant's case on which the non-movant bears the burden of proof at trial, the non-movant must then present competent summary judgment evidence to support the essential elements of its claim and to demonstrate that there is a genuine issue of material fact for trial.  *Nat'l Ass'n of Gov't Empl. v. City Pub. Serv. Bd.,* 40 F.3d 698, 712 (5th Cir. 1994).  "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial."  *Celotex,* 477 U.S. at 323.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indust. Co.*, 475 U.S. at 586 (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Instead, the non-moving party must produce evidence upon which a jury could reasonably base a verdict in its favor.  *Anderson*, 477 U.S. at 250; *see also DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006).  To do so, the non-movant must "go beyond the pleadings and by its own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is genuine issue for trial."  *Webb v. Cardiothracic Surgery Assoc. of N. Tex., P.A.*, 139 F.3d 532, 536 (5th Cir. 1998).  The court is not required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).

### III.     Cross-Motions for Summary Judgment on King's FLSA Claim for Unpaid Overtime Wages

Both parties move for summary judgment on King's FLSA claim for unpaid overtime wages.  The substantive law governing this claim is the FLSA.  Therefore, it dictates which facts are material to King's claims.  *Anderson*, 447 U.S. at 248.

"In 1938, Congress enacted the FLSA to 'protect all covered worked from substandard wages and oppressive working hours."  *Meza v. Intelligent Mexican Mktg., Inc.*, 720 F.3d 577, 581 (5th Cir. 2013) (citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981)).  Section 207 of the FLSA requires employers to pay all nonexempt employees at least one and a half times their regular rate of pay for hours worked in excess of forty per work week.  *Rainey v. McWane, Inc.,* 314 Fed. Appx. 693, 694 (5th Cir. 2009) (citing 29 U.S.C. § 207(a)); *Vela v. City of Houston*, 276 F.3d 659, 666 (5th Cir. 2001); *Thibodeaux v. Executive Jet Int'l, Inc.*, 328 F.3d 742, 749 (5th Cir. 2003)).  Employers who violate the FLSA are liable for "unpaid overtime compensation…and in an additional amount as liquidated damages."  29 U.S.C. § 216(b).  Moreover, any person who repeatedly or wilfully violates Section 206 or 207, relating to wages, shall be subject to a civil penalty not to exceed $1,000 for each such violation."  *Id.* § 216(e)(2).[2]  Those who are employed in bona fide executive, administrative, or professional capacity . . . or in the capacity of an outside salesman (as defined in section 203(k) of the FLSA) are exempt from the FLSA's overtime requirements.  29 U.S.C. § 213(a)(1).  These exemptions are defined by the Secretary of Labor at 29 C.F.R. § 541.0 *et seq.*  The exemptions are narrowly construed against the employer, and the employer bears the burden of demonstrating that an employee is exempt.  *Tyler v. Union Oil Co. of Cal.,* 304 F.3d 379, 402 (5th Cir. 2002), *citing Dalheim v.*

---

[2] Under the FLSA, a violation is "willful" if the employer "'either knew or showed reckless disregard for...whether its conduct was prohibited by the statute.'"  *Singer v. City of Waco, Tex.,* 324 F.3d 813, 821 (5th Cir. 2003) (citing *Reich v. Bay, Inc.,* 23 F.3d 110, 117 (5th Cir. 1994)).  The plaintiff bears the burden of demonstrating that the violation was willful.  *Id.*

*KDFW–TV,* 918 F.2d 1220, 1224 (5th Cir. 1990).  Whether an employee is exempt or not exempt under FLSA is mainly a fact issue determined by his salary, duties and application of the factors in 29 C.F.R. § 541.0 *et seq.*, but the ultimate decision is a question of law.  *Lott v. Howard Wilson Chrysler–Plymouth, Inc.,* 203 F.3d 326, 330–31 (5th Cir. 2000); *McKee v. CBF Corp.,* 299 Fed. Appx. 426, 429 (5th Cir. 2008); *Dalheim,* 918 F.2d at 1226.

In order to establish a claim for unpaid overtime wages under section 207, a plaintiff bears the burden of proving the following *prima facie* case by a preponderance of the evidence: (1) the existence of an employment relationship; (2) that plaintiff was engaged in commerce or employed by an enterprise engaged in commerce; (3) that defendant failed to pay overtime required by the FLSA; and (4) that plaintiff is owed the amount claimed by a just and reasonable inference.  29 U.S.C. § 207; *see also Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005).

King asserts that the undisputed facts in this case establish all of these elements. Defendants challenge only the fourth element of King's *prima facie* case by contending that King was exempt from the FLSA requirements by reason of the executive, administrative, or outside sales exemptions, or a combination thereof.  King argues that Defendants cannot show that any of these exemptions apply to him.  Thus, the resolution of both motions in regard to King's FLSA claim will turn on the applicability of these exemptions to the facts of this case.

Each of the four exemptions claimed by SBD requires the Court to determine what constitutes King's "primary duty."  The regulations define an employee's "primary duty" as "the principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  In applying this definition, courts consider what aspects of the employee's job are "of principal value to the employer."  *Dalheim*, 918 F.2d at 1227.  Factors that may be

considered in determining an employee's "primary duty" include "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee."  *Id.*; *accord Gellhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1078 (E.D. Tex. 2011).  "Employees who spend more than 50 percent of their time performing work may still meet the primary duty requirement if other factors support such a conclusion."  *Gellhaus*, 769 F. Supp. 2d at 1078 (citing 29 C.F.R. § 541.700(b)).

### A.    *The Executive Exemption*

Defendants argue that King was exempt from the FLSA's overtime requirements under the executive exemption.  The regulations define an executive employee as any employee who is:

> (1) Compensated on a salary basis at a rate of not less than $455 per week....;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

Management is defined in the regulations to include activities such as:

> interviewing, selecting, and training employees; maintaining production or sales records for use in supervision or control; appraising employee's productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery,

equipment, or tools to be used or merchandise to be bought, stocked, and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102; *Gellhaus*, 769 F. Supp. 2d at 1079–80.

The regulations define the term "two or more other employees" to mean "two full-time employees or their equivalent." 29 C.F.R. § 541.104(a). "The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function." *Id.* § 541.103(a). Factors such as whether an employee works in more than one location or continually works with the same subordinate personnel are not determinative of this issue if other factors demonstrate that the employee is in charge of "a recognized unit with a continuing function in the organization." *Id.* § 541.103(c).

When examining whether an employee's suggestions and recommendations are given particular weight, courts should consider "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which such suggestions and recommendations are relied upon." *Id.* § 541.105. It is not required that the executive have the authority to make the ultimate decision, however, the suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. *Id.* Occasional suggestions with regard to the change of a co-worker's status will not qualify. *Id.*

It is undisputed that King meets the salary requirement of the executive exemption. King earned $900 per week throughout the relevant time period. The parties dispute whether or not King satisfies the other three criteria for the executive exemption. King argues that nothing in

his job description indicates that he: (1) had responsibility over "management" of the enterprise or of a customarily recognized department or subdivision thereof; (2) "directed" the work or two or more other employees; (3) had the authority to hire or fire other employees, or make suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees; or (4) was responsible for the sale of Defendant's products. Doc. 13 at 5.

SBD contends that the uncontroverted evidence shows that King was responsible for managing between seven and thirteen different employees in a sales team that serviced between six and ten sales routes in King's territory, that each sales team is a recognized subdivision in the company, and that King made recommendations regarding the hiring and promotion of other employees that were given particular weight.  Doc. 14 at 9–13.

The evidence in the record clearly demonstrates that each sales team was a unit or subdivision of the sales department with permanent status and function at SBD and that King regularly directed the work of more than two full-time employees.  Stevenson Dep. at 25:15–28:23; SBD Org. Chart.  Therefore, the Court's inquiry will focus on the second and fourth prongs.

With regard to the second prong, the record reveals that King's managerial responsibilities as a team leader were extensive and of primary importance to SBD.  King attempts to argue in his response to Defendants' motion for summary judgment that he was not a manager; however, the record belies that assertion.  Doc. 17 at 6–7.  King's primary functions, as described by him, the other team leaders, and the Team Leader Job Description, included: training salesmen, providing his sales team with daily assignments and instruction, inspecting and documenting salesmen's performance of their assigned tasks which would be used in

supervising, controlling, and compensating them, coaching his salesmen on how to improve their performance, assisting salesmen in determining which rotation plan best meets their route schedule, and controlling the flow and distribution of the product along the sales routes.  Team Leader Job Description; King Dep. at 126:4–129:7, 281:5–18, 286:16–289:9, 295:3–21, 346:20–25, 349:7–350:19; Pitcock Decl.; Hollis Decl.  These tasks comprised the vast majority of King's daily and weekly responsibilities, were of primary importance to SBD, and are all defined as "management" activities within the DOL regulations.

     With regard to the fourth prong, the parties dispute whether King had authority to hire or fire any employees.  Stevenson Dep. at 76:14–19, 86:13–87:1; King Dep. at 346:20–347:6; Smith Dep. at 61:2–63:7.  Whether or not King had authority to make the ultimate decision, however, is not dispositive as long as his recommendations were given particular weight.  King admitted in deposition that he occasionally requested that the operations manager facilitate discipline for underperforming employees.  King Dep. 249:1–253:15; 347:7–15.  He stated that his recommendations were taken very seriously by operations manager Jodi Van Dyke, but after Van Dyke resigned in June 2010 and Lori Smith became the operations manager, his recommendations were not given serious consideration.  King Dep. 152:6–155:17.  The recommendations of other team leaders, he said, were routinely accepted.  *Id.* 155:6–8.  The Team Leader Job Description also states it is an essential function of team leader to "write up sales[men] for poor rotation," indicating that it was part of King's job to make such suggestions and recommendations.

     King's response to Defendant's motion for summary judgment emphasizes the management activities listed in the regulations which King *did not* perform.  He fails to identify, however, any non-managerial work that he performed and therefore, fails to negate Defendants'

summary judgment evidence.  *See Rainey*, 314 Fed. Appx. at 695 (upholding summary judgment for employer where employees failed to provide any argument that supervisors' primary duty was non-managerial work).  The Court finds that the record case contains adequate evidence to show that King's primary duty was management of a subdivision of the sales department, that he customarily and regularly directed the work of more than two employees, and that his recommendations about discipline, hiring, and firing or employees were given particular weight. The evidence put forth by King is not sufficient to create a material fact issue.  Defendants have met their burden to show that King was exempt from the requirements of the FLSA under the executive exemption.

### B.     The Administrative Exemption

Defendants argue that King was exempt from the FLSA's overtime requirements under the administrative exemption.  Doc. 14 at 14–16.  Administrative employees are those "[w]hose primary duty is the performance of office or non-manual work directly related to management policies or general business operations for the employer or the employer's customers," and "[w]hose primary duties include the exercise of discretion and independent judgment with respect to matters of significance."   29  C.F.R.  §  541.200(a)(1).    The term "matters of significance" denotes "the level of importance or consequence of the work performed."  *Id.* § 541.202(a).   "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  *Id.* § 541.201.

Types of work that are "directly related to management or general business operations" include: tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing

procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; government relations; computer network; internet and database administration; legal and regulatory compliance; and similar activities. *Id.* § 541.201(b). The "exercise of discretion and independent judgment" generally involves the "comparison and evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* § 541.202(a).

> "Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances."

*Id.* § 541.202(b). The regulations provide an non-exhaustive list of examples of employees that would qualify for the administrative exemption including "an employee who leads a team of other employees assigned to complete major projects for the employer (such as purchasing, selling or closing all or part of the business, negotiating a real estate transaction, or collective bargaining agreement, or designing and implementing productivity improvements).

Defendants argue based on this example that because King was a "team leader," he falls under the administrative exemption. Defendants further argue that King exercised independent judgment and discretion with regard to (1) coordinating the daily assignments of his team; (2)

monitoring and evaluating the work of his direct reports; (3) determining which tasks in the field needed to be accomplished without any direct oversight; (4) negotiating with retailers to secure "premium shelf and advertising space in the store."  Doc. 14 at 15.  King responds that he worked primarily in the field—not in an office, and that he had no authority to exercise any discretion with respect to matters of significance to SBD.  Doc. 17 at 13.

The evidence in the record indicates that King's primary duty was supervising his sales team, not performing office or non-manual work directly related to management policies or general business operations of SBD or SBD's retail customers.  Although King was a "team leader," his team had an ongoing responsibility to the company to distribute its products—not complete "major projects."  Nothing in the record suggests that King's "primary duty" consisted of any of the types of work outlined in § 541.201(b).

Moreover, the record indicates that King was rarely if ever able to exercise any discretion or independent judgment with respect to matters of significance to SBD.  When asked at deposition if King had the authority to negotiate or commit the company in matters that would have significant impact, Stevenson responded that King "made decisions on a day-to-day basis that were very important," but the only examples he gave were that King had authority to negotiate with retailers for shelf and advertising space and could try to persuade retailers to run specials or promotions.  *Id.* at 72:9–74:22.  These were certainly not negotiations that would affect SBD's business operations or finances to a substantial or even insubstantial degree.  Stevenson testified that King had no authority to negotiate the actual prices of the beer with the retailers.  *Id.*  When asked to identify a management policy that King developed during the course of his employment, Stevenson could not name a single one.  Stevenson Dep. at 70:6–71:16.  Similarly, Stevenson could not identify a single contract that King ever signed on behalf

of the company, and Stevenson admitted that King was not responsible for developing any legal or compliance measures. *Id.* at 75:3–5, 89:16–18. Stevenson also stated that King did not have authority to waive or deviate from establishment management policies without prior approval. *Id.* at 71:21–24. Indicating just how little discretion King had, Stevenson stated that King would have to go through the sales execution coordinator or the operations manager to procure something as basic as a tub for displaying single cans of beer for one of his accounts. *Id.* at 75:19–76:5. In light of these facts, the Court finds that Defendants have failed to meet their burden to show that King was exempt from the requirements of the FLSA under the administrative exemption.

### C.   *The Outside Sales Exemption*

Defendants argue that King was exempt from the FLSA's overtime requirements under the outside sales exemption. Doc. 14 at 16–17.

"The logic of this exemption is that… [a]n outside salesman's extra compensation comes in the form of commissions, not overtime, and because most of the salesman's work is performed away from the employer's place of business, the employer often has no way of knowing how many hours an outside salesman works." *Meza*, 720 F.3d at 581 (citing *Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941)). The DOL regulations define an outside salesman as an employee:

(1) Whose primary duty is:

(i) making sales within the meaning of section 3(k) of the Act, or

(ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(2) Who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty.

29 C.F.R. § 541.500(a)(1)–(2).

Defendants argue that King qualifies for the outside sales exemption because he "spent the vast majority of his time each day away from the office and out in the field performing activities directly related to SBD's sales efforts without any direct supervision." Doc. 14 at 16. Defendants state that King "negotiate[d] directly with customers to solicit orders for new products, negotiate[d] discounts on SBD products that would result in favorable sales for the company, and secure premium shelf and advertising space in the store." *Id.* at 16–17.   In addition, King engaged in "team sells," where he and one of his salesmen "would visit retailer with a specific sales objective" (i.e., new orders, priority tap or cooler space). *Id.*   King argues that he was not employed as a salesman, but as a supervisor of salesmen, and that he was not responsible for sales in anyway.

There is no evidence in the record that King's primary function was to solicit orders from retailers and Stevenson stated in deposition that King had no authority to negotiate prices with the retailers.  Stevenson Dep. at 73:22–74:4.  Although King spent much of his time in the field, nothing in the record indicates that he received any commissions or that his compensation was affected by sales in anyway.  As such, the Court finds that the facts at issue are not consistent with the spirit and intent of the exemption.  Moreover, the examples of "sales" efforts discussed by Defendants, such as negotiating premium advertising or sales space, are specifically cited in the regulations as examples of activities that would be excluded from the exemption.  *See* 29 C.F.R. § 541.504(d)(3) (Employees engaged in activities intended to promote sales by customers such as "placing point-of-sale and other advertising materials, price stamping commodities, arranging merchandise on shelves, in coolers or cabinets, rotating stock according to date, and

cleaning and otherwise servicing display cases," do not qualify for the exemption, "unless such work is in furtherance of the [employee]'s own sales efforts.").

The facts in the record do not show that King's primary duty was making sales. Defendants have failed to meet their burden to show that King was exempt from the requirements of the FLSA under the outside sales exemption.

### D.      The Combination Exemption

Lastly, Defendants argue that King was exempt from the FLSA's overtime requirements under a combination of the executive, administrative, and outside sales exemptions.  Doc. 14 at 16–17.

The FLSA provides:

> Employees who perform a combination of exempt duties as set forth in the regulations in this part…may qualify for exemption.  Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption.  In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.

29 C.F.R. § 541.708.  According to the Secretary, this exemption is intended to address "the situation that exists when an employee does not meet the primary-duty requirement of any individual exemption."  *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 294 (4th Cir. 2007).  It is "a mechanism for cobbling together different exempt duties for purposes of meeting the primary-duty test."  *Id.*  Where, as here, the employee *does* meet the primary-duty requirement of an individual exemption, the combination exemption does not apply.

In sum, the Court concludes that Defendants have demonstrated that King was exempt from the overtime provision of the FLSA as a matter of law pursuant to the executive exemption. King's motion for partial summary judgment on his FLSA claim is denied and Defendants' motion for summary judgment on King's FLSA claim is granted.

**IV.     SDB's Motion for Summary Judgment on King's TCHRA and ADEA Claims**

SBD moves for summary judgment on King's age discrimination claims under the TCHRA and the ADEA.  Both statutes prohibit an employer from discharging or otherwise discriminating against any employee because of his or her age.  29 U.S.C. § 623(a)(1); TEX. LABOR CODE § 21.051; *Miller v. Raytheon Co.*, 716 F.3d 138, 144 (5th Cir. 2013).  A disparate treatment claim, which King raises, refers to deliberate discrimination in the terms or conditions of employment.  *See* 29 U.S.C. §§ 623; TEX. LABOR CODE § 21.051.  The requirements for establishing a *prima facie* discrimination claim under the TCHRA mirror those of the ADEA. *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 465 (5th Cir. 2005).  Because King's age-discrimination claim is based on circumstantial rather than direct evidence of discrimination, the Court applies the familiar burden-shifting framework of *McDonnell Douglas* in analyzing his claims.  *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (The Fifth Circuit applies *McDonnell Douglas* analysis to age-discrimination claims brought under the TCHRA and the ADEA.); *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).

To make out a *prima facie* case of age discrimination, the employee must show that he was (1) a member of a protected class (over the age of forty); (2) qualified for his position; (3) subject to adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably.  *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004).  "To establish disparate treatment[,] a plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees."  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 514 (5th Cir. 2001).

The plaintiff's burden is "not onerous;" the plaintiff must simply provide sufficient evidence to give rise to an inference of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). A plaintiff's subjective belief that he was discriminated against is insufficient to establish a *prima facie* case of discrimination under the TCHRA or the ADEA. *Vasquez v. Neuces Cnty. Texas*, ⸺ Fed. Appx. ⸺, No. 13–40453, 2013 WL 6670973, at *2 (5th Cir. Dec.19, 2013), (citing *Baltazor v. Holmes,* 162 F.3d 368, 377 n.11 (5th Cir.1998)).

If the employee meets his burden to establish a *prima facie* case, the employer then has the burden to rebut the presumption by articulating a legitimate, non-discriminatory reason for its decision. *Patrick*, 394 F.3d at 315. Then, in order to avoid summary judgment, the burden shifts back to the employee. "Importantly, the TCHRA and the ADEA involve a different causation inquiry at the third stage of the *McDonnell Douglas* analysis." *Reed*, 701 F.3d at 440. Under the TCHRA, the employee must show "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor ('mixed motive')." *Id.* at 439–40 (citing *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex.App.—Dallas 2010, no pet.)). "Under the ADEA, a plaintiff must prove that age was the 'but for' cause of the challenged adverse employment action." *Id.* (citing *Moss v. BMC Software, Inc.*, 610 F.3d 917, 928. The ultimate burden of persuasion rests with the plaintiff. *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142–42 (2000).

SBD challenges only the fourth element of King's *prima facie* case. Doc. 14 at 23–23. SBD asserts that King has not established, through competent summary-judgment evidence, the presence of a genuine dispute that King was treated less favorably than similarly situated younger employees. *Id.*

King compares himself to two younger employees, Jimmy Clegg and Quinton Hollis, who he claims repackaged and distributed expired beer, yet were not terminated.  Doc. 17 at 18–19.  According to King, "it was common practice to repackage out of date beer" and he had "personally witnessed a younger team leader, Jimmy Clegg, repackage out of date beer at least ten times, yet he was not terminated."  Doc. 17 at 18.  Likewise, "Quinton Hollis was disciplined on more than one occasion for having expired product in his market, yet he was not terminated." *Id.* at 19.  King stated at deposition that he once "documented" the fact that he found expired beer in Clegg's market by writing, "So–so-and-so—so-and-so, 12-packs, what kind of beer it was, the date, and moved into a different account," and "turned it into the warehouse."  King Dep. at 218:9–18.  He could not recall if he provided the documentation to Jodi Van Dyke or Lori Smith.  *Id.* at 219:20–224:2.  King has not offered any evidence to support his allegation that Quinton Hollis repackaged expired beer or that he was disciplined for doing so.  Both Smith and Stevenson testified that they had never received another complaint about another team leader repackaging expired beer.  Smith Dep. at 48:9–49:15; Declaration of Lori Smith ¶ 3 ("Smith Decl.") (Doc. 14-22); Stevenson Decl. ¶ 5.

SBD argues that Quinton Hollis and Jimmy Clegg are not similarly situated to King because (1) Quinton Hollis is not a team leader and (2) King has failed to present any evidence that either Smith or Stevenson, who respectively recommended and approved King's termination, ever knew of Clegg having repackaged and sold expired beer.  Doc. 20 at 1.  As such, SBD argues, King fails to establish a *prima facie* case of age discrimination.

In his response to Defendants' motion for summary judgment, King argues that Defendants "have not provided any explanation as to why Jimmy Clegg, who lied and falsified documents on several occasions was not terminated immediately, but only counseled…[y]et after

thirty years with the company, [] King was terminated for similar violations, without any counseling or written warning."  Doc. 17 at 19.

The Court finds that King has failed to make out a *prima facie* case of age discrimination because neither Jimmy Clegg nor Quinton Hollis are similarly situated to King.  In general, courts have held that "employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be 'nearly identical,'" as required to establish disparate treatment.  *Hockman v. Westward Commc'n*, 282 F. Supp. 512, 5277–28 (E.D. Tex. 2003).  Quinton Hollis was a not a team leader, but a salesmen.  He had different responsibilities, different capabilities, and a different supervisor.  In addition, King has not alleged that neither Smith nor Stevenson ever knew that Hollis repackaged expired beer.  Therefore, Quinton Hollis is not a valid comparator for purposes of analyzing King's age discrimination claim.  Although Jimmy Clegg did hold the same position as King, and therefore had the same capabilities, responsibilities, and supervisor, King fails to raise a fact issue that either Smith or Stevenson knew that Clegg repackaged expired beer.  King claims only that Smith and Stevenson knew that Clegg falsified company documents by stating that he had inspected accounts which he had not.  Clegg's work rule violations are not "nearly identical" to King's.  *See Bouie v. Equistar Chems. LP*, 188 Fed. Appx. 233, 237 (plaintiff discharged for violating two safety protocols could not use comparator who violated only one safety protocol); *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990) (employees who engaged in different violations of company policy were not nearly identical).  Therefore, Clegg is not a valid comparator for purposes of analyzing King's age discrimination claim.  Because King's "similarly situated" comparators are not "nearly identical" to him, King cannot establish a *prima facie* case of age discrimination.

Even if King were able to establish a *prima facie* case of age discrimination, SBD has articulated a legitimate nondiscriminatory reason for King's termination, and produced records of SBD's and Anheuser-Busch's company policy which strictly prohibit the conduct for which King was terminated.  Anheuser-Busch Over-Age Removal Policy (Doc. 14-17); SBD Out of Date Beer Policy (Doc. 14-18).  In addition, King admitted in his deposition that Lori Smith favored the two older team leaders, Ricky Pitcock and Eddie Hollis, over him.  King Dep. 142:20–148:10, 155:1–8.  Of the four team leaders employed by SBD at the time of King's termination, it is the two older team leaders, Pitock and Hollis, who are still employed and the two younger team leaders, King and Clegg, who have been terminated.  These facts contradict King's allegations of age discrimination.

King can neither make out a *prima facie* case of age discrimination, nor show any evidence of pretext.  He has failed to offer any evidence whatsoever that his termination was based on his age.  Accordingly, Defendants are entitled to summary judgment as a matter of law on King's age discrimination claims.

## V.     Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Plaintiff Shannon King's Motion for Leave to File Plaintiff's First Amended Complaint (Doc. 15) is **GRANTED** and his Motion for Partial Summary Judgment (Doc. 13) is **DENIED**. It is further

**ORDERED** that Defendants Stevenson Beer Distributing Company and Kurt Stevenson's Motion for Summary Judgment as to all of King's claims is **GRANTED** and King's case is **DISMISSED**.

Final judgment will be entered by separate document.

SIGNED at Houston, Texas, this 27th day of March, 2014.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE